## Van Millican v. The State.

No. 1157.  Decided October 25, 1911.

Rehearing denied November 15, 1911.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon appeal from a conviction of murder in the first degree, the evidence sustained the verdict, there was no reversible error.

**2.—Same—Evidence—Cross-Examination—Motive.**

Upon trial of murder, there was no error in showing the relation of defendant's witness to the defendant and his brother in order to show interest and motive; besides, the bill of exception was insufficient.

**3.—Same—Evidence—Cross-Examination—Threats.**

Where defendant brought out, on cross-examination of the witness, the threat by the defendant against the deceased and the communication thereof to the latter, etc., there was no reversible error in permitting the State to cross-examine this witness on that point; besides, the bill of exceptions was insufficient.

**4.—Same—Evidence—Bill of Exceptions.**

Upon trial of murder there was no error in refusing defendant's witness to testify that he asked another for a gun; or in tendering a witness to the defendant; or in permitting a State's witness in testifying that if there had been anybody with the deceased, the witness could and would have seen him. Besides, the bill of exceptions was insufficient.

**5.—Same—Reading Law to Jury—Discretion of Court.**

Upon trial of murder, there was no error in the court's refusal to permit defendant's attorneys to read the law of a case to him with which he was familiar.

**6.—Same—Argument of Counsel—Practice.**

Where, upon trial of murder, State's counsel urged the jury to hang the defendant, and not let it go out that a negro was not hanged for killing a white man, while improper was not cause for reversal, in view of the fact that the jury assessed a life sentence; besides, there was no request in writing to withdraw said argument.

**7.—Same—Argument of Counsel—Bystanders—Mob Trial.**

Where, upon appeal from a conviction of murder, the qualification of defendant's bill of exceptions showed that there was nothing either in the trial or argument of counsel that suggested a mob trial, there was no reversible error.

**8.—Same—Argument of Counsel.**

Where, upon trial of murder, there was evidence that one of defendant's witnesses, about whom the trouble apparently arose, was the son of defendant's principal witness, there was no error to permit State's counsel to argue this point to the jury or comment thereon.

**9.—Same—Charge of Court—Bill of Exceptions.**

Where, upon appeal, appellant claimed that the court erred in marking out certain words that appeared to have been originally written in the charge, the matter could not be considered in the absence of a bill of exceptions.

**10.—Same—Charge of Court—Self-Defense—Resisting Arrest.**

Where, upon trial of murder, the defendant claimed that he had resisted an unlawful arrest by the deceased and was forced to kill him in self-defense in freeing himself from such unlawful arrest, and the court in his charge on self-defense presented this phase of the case more favorably to appellant than the special charge requested, and the same was not subject to the criticism made upon it by appellant, there was no reversible error.

**11.—Same—Charge of Court—Interest of Witness—Limiting Testimony.**

Where, upon trial of murder, the effect of the State's testimony, with reference to showing that one of the defendant's witnesses was the father of defendant's brother, was for the purpose of showing the interest of witness instead of impeaching him, there was no error in the court's failure to limit such testimony.

**12.—Same—Charge of Court—Limiting Testimony.**

Where, upon trial of murder, the State introduced testimony that the brother of defendant ran his buggy against deceased, and that deceased cursed him, which angered the defendant; for the purpose of showing motive, there was no error in the court's failure to limit said testimony.

Appeal from the District Court of Burleson. Tried below before the Hon. Ed R. Sinks.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*V. B. Hudson, J. R. Heslep* and *John N. Mathis,* for appellant.—Upon question of showing relationship between defendant's witness and defendant's brother: Conway v. State, 33 Texas Crim. Rep., 327; Ellis v. State, 56 Texas Crim. Rep., 15; Hall v. State, 43 Texas Crim. Rep., 479; McCray v. State, 38 Texas Crim. Rep., 609; Sheppard v. State, 56 Texas Crim. Rep., 604; Wade v. State, 48 Texas Crim. Rep., 513; Goad v. State, 52 Texas Crim. Rep., 444.

Upon question of fair and impartial trial free from outside interference: Manning v. State, 37 Texas Crim. Rep., 180; Hamilton v. State, 36 Texas Crim. Rep., 372; Kennedy v. State, 19 Texas Crim. App., 618; Cartwright v. State, 16 Texas Crim. App., 473; Eans v. State, 10 Texas Crim. App., 421.

Upon question of argument of counsel: Davis v. State, 54 Texas Crim. Rep., 236; Smith v. State, 55 Texas Crim. Rep., 563; Smith v. State, 44 Texas Crim. Rep., 137; Exon v. State, 33 Texas Crim. Rep., 461; Tillery v. State, 24 Texas Crim. App., 251; McKinney v. State, 52 Texas Crim. Rep., 182; Askew v. State, 54 Texas Crim. Rep., 414; Battles v. State, 53 Texas Crim. Rep., 202; Bearden v. State, 46 Texas Crim. Rep., 144.

Upon question of court's charge on self-defense and refusing requested charges: Dyson v. State, 14 Texas Crim. App., 454; Cortez v. State, 43 Texas Crim. Rep., 375; id., 44 Texas Crim. Rep., 169; Owen v. State, 125 S. W. Rep., 405; Miers v. State, 34 Texas Crim. Rep., 161.

Upon question of court's failure to limit testimony: Davidson v. State, 22 Texas Crim. App., 372; Buckler's Digest, p. 649, secs. 21, 22, 25.

Upon question of court's charge on self-defense: Harris v. State, 55 Texas Crim. Rep., 469; Moody v. State, 52 Texas Crim. Rep., 232; Baird v. State, 52 Texas Crim. Rep., 96.

*C. E. Lane,* Assistant Attorney-General, for the State.—Upon question of showing interest and motive of witness: Stevens v. State, 7 Texas Crim. App., 39; Daffin v. State, 11 Texas Crim. App., 76.

Upon question of threats brought out on cross-examination: Edwards v. State, 61 Texas Crim. Rep., 307, 135 S. W. Rep., 540; Noftsinger v. State, 7 Texas Crim. App., 301.

PRENDERGAST, JUDGE.—The appellant was indicted by the grand jury of Brazos County for the murder of S. H. Barker therein on March 24, 1910. The venue of the case was changed to Burleson County and a trial resulted in his conviction on December 3, 1910, of murder in the first degree and a life penalty given.

The theory of the State was that the appellant in effect waylaid and shot and killed the deceased. This was denied by the appellant and he claimed that the deceased, shortly before the killing, had illegally arrested him and restrained him of his liberty, the deceased

not being an officer and having no authority or power whatever to arrest or restrain him, and that after being so arrested and restrained, in attempting to regain his liberty it became necessary to kill him to do this, and that the deceased shot at him first and that he then shot the deceased, believing himself to be in danger of serious bodily injury or death at the hands of the deceased, and in his attempt to free himself.

It is unnecessary to state the evidence. We have carefully, more than once, gone over and considered it, and it is our opinion that the preponderance of the evidence established the State's theory of the killing, and that while the testimony for the defendant would have authorized his acquittal, it was a question for the jury and the lower court, and this court is bound by the verdict of the jury and the decision of the lower court on that point.

The appellant has ten bills of exceptions which he presents, and one charge refused, and he attacks the charge of the court in some particulars, claiming that error is thereby shown which should result in the reversal of the case.

Appellant's first bill is: "Be it remembered, that upon trial of the above entitled and numbered cause, the defendant's witness, George Dunlap, a white man, being upon the stand, was asked by the prosecution upon cross-examination the following questions, to wit: Q. Baby Thomas is your son—I mean Dunlap? To which the defendant then and there, by counsel, objected that said question was asked for the purpose, and the only purpose, to prejudice the right of this defendant before this jury—and the further objection that you couldn't require this man to answer that character of question anyway.

"Which objections of the defendant to the said question were by the court overruled, and the court permitted the said question to be asked of said State's witness, George Dunlap, and the said witness was further required to answer said question, which he did as follows, to wit: A. 'I will not answer it.' And said answer of said witness was permitted to go to the jury as evidence in the case, to all of which action and ruling of the court the defendant then and there, by counsel, excepted, and he now tenders this bill of exceptions, and asks that the same be allowed, signed and filed as a part of the record in this cause." The court in allowing it made this explanation: "The witness, Baby Dunlap, and the defendant had the same mother, the question was permitted to show interest or friendship for defendant on the part of the witness, George Dunlap. The State did not insist on an answer after the witness declined to answer the question."

The second bill shows that while the State's witness, Jeff Barker, was on the stand on redirect examination, after being crossed by the defendant, he was asked: "Q. You stated that your brother told you he had sent him a threat? A. Yes, sir. Q. What sort of a threat?" To this question the appellant objected because the answer would be hearsay. The court replied, "You brought it out on cross-examina-

tion; of course, ordinarily I would sustain the objection." Appellant's attorneys: "The testimony came out." The Court: "The record will show exactly what was done about that." The witness thereupon answered: "He told me that he sent his little nigger boy to old Dan Choose to take his horse to him—that he had been working—and this nigger came out to the road and met this little nigger boy and told him to tell Mr. Barker, or Sidney—I don't remember which—that if he knew what was good for him that he would leave little Baby Dunlap alone, or what he would do for him when he met him would be a plenty," to which appellant excepted. The court in allowing the bill made this explanation: "The defendant having brought out on cross-examination, and whereof I was of the opinion that the State had the right to question the witness on the matter."

Bill No. 3 shows that Sam Sims, the State's witness, on cross-examination by defendant testified that while he and Mr. Meredith were coming back a negro boy, Riley Thomas, who lived at that time with Al Smith, who lived out about a mile and a half in the direction he came from, caught up with them. He was then asked this question: "That nigger boy wanted to get a gun, didn't he?" to which the State objected because it had nothing to do with the case and the deceased was not present at the time. That witness would have answered that he asked Mr. Meredith for a gun for Al Smith. Appellant states that the object and purpose of this question and answer was that the contention of the defense is that the deceased, his brother and friends, had made up a plot or was making up a plot for the purpose of whipping this negro, and if he resisted, to kill him, and they were gathering together with guns for that purpose. The court in ruling on the question said: "I don't know whether it would be material—I will sustain the objection for the present." There was no other offer at that or any other time, so far as the record shows, to ask this question for the purpose for which appellant claims it was asked, nor is there any evidence in the record tending to show any such plot for any such purpose.

Bill No. 4 shows that the attorney, J. P. Buchanan, private prosecutor for the State, in the presence and hearing of the jury, just before the State closed or rested, said: "With this statement to the court, that we have Doctor Meredith here—and the defendant has a perfect right to use him, and we offer him to the defense—we close," which remark was objected to by the appellant for the reason that said Meredith is a friend to the prosecution, has assisted in employing private counsel to prosecute and was the first witness for the State in the trial of the case when defendant was previously tried at Bryan and that counsel knew that the defense was not in a position to put him on the stand, because he knew he was antagonistic to the defense, and if the defendant had put him on the stand he would have had to vouch for him as a witness, which he was

unwilling to do, and unwilling to go into the camp of the enemy for testimony. The attorney for the State made no reply to this. The court, in allowing the bill, made this explanation: "When Mr. Buchanan made this remark above, counsel for plaintiff thanked him unequivocally for his liberality, stating that it was a well known fact that they could put anyone on the witness stand in regard to the matter as tried."

Bill No. 5 states that while the State's witness, Mrs. Mary Sims, was on the stand she was asked and answered these questions: "Q. Now, Mrs. Sims, was there anybody with Mr. Barker? A. Not that I seen. Q. If there had been anybody with him would you have seen them? A. Yes, sir, I could have seen him—and would have seen him." Appellant objected to the question because the answer would be merely an opinion of the witness and she would testify to an opinion and not a fact. The court overruled the objection and permitted the answer.

Bill No. 6 complains that upon the trial and while Mr. Buchanan, private prosecutor for the State, was making his closing argument to the jury, there had gathered a large crowd in the courtroom, crowding inside the bar and standing up just outside of it upon the benches as thick as men could stand together, hovering around the jury; that frequently during this time they gave vent to their feelings in this: That while Mr. Buchanan was speaking every reference he made to the defendant or some fact in the case that suited the fancy of the crowd they would laugh out loud in such a manner as to call the attention of the jury to the fact that they were in sympathy with the prosecution; that appellant's attorney squirmed himself through the crowd to the judge's stand and there suggested to the court that the defendant was not getting a fair and impartial trial; that the crowd ought to be seated and reprimanded for giving vent to their feelings as they had done. That appellant's counsel did this quietly in order not to offend the crowd, but especially of not calling the attention of the jury to that fact; that the court only said that he was going to keep them quiet, but failed to do so, and again and again the crowd gave vent to their feelings as above described, showing their approbation and sympathy with the prosecution in the case; that appellant's counsel then interrupted Mr. Buchanan in open court and appealed to the court, saying that defendant ought to have and is entitled to a fair and impartial trial, and appealed to the court for protection against this open demonstration by the audience, saying that this was not a mob trial, but a judicial trial, and appealed to the court for protection. The court thereupon admonished the crowd to keep order and not make any further demonstrations; that thereupon the audience remained in the same position and made no vocal demonstrations, but continued to make facial demonstrations. In allowing the bill the court qualified it as follows: "Two speeches were made at night—one for the defendant and one for the State.

There was a large crowd present to hear the speeches, but they did not crowd around the jury; several times there was laughter in the audience, but there was nothing unusual. I regarded Mr. Heslep's remarks as made for effect. There was nothing either in the trial or argument that suggested a mob trial or anything other than an ordinary trial of a murder case."

Appellant's seventh bill complains of the action of the court in refusing to permit appellant's attorneys to read to him in the presence and hearing of the jury the opinion of the court in the case of Mier v. State, 34 Texas Crim. Rep., 161. The court in allowing this bill, stated: "I was familiar with the case sought to be read to me, and saw no reason why I should hear counsel read it."

Bill No. 8 complains that in the closing argument of Mr. Buchanan he stated: "Gentlemen of the jury, if you don't hang this nigger— Van Millican—and let it go out from this courthouse that a nigger was not hung for killing a white man, you will put the devil in the head of every nigger in this country, and they will say, Van Millican, a negro, who was backed by a white man, had escaped the just penalty of the law, and if you don't hang him, God knows what the result will be." That appellant objected to this argument because there was nothing in the record to justify it, and it was made for the purpose, and made for the only purpose, of inflaming the minds of the jury against appellant, a negro being tried before a jury of white men. When appellant's counsel objected to this statement and asked that he be stopped from making statements of this character and that this remark be withdrawn from the jury, the court replied: "You can have your bill of exceptions," and it is claimed by appellant that the jury were thereby led to believe that the court thought the statement was all right and gave the court's approbation to the denunciation of the defendant. The court in allowing this bill, qualified it as follows: "Mr. Buchanan had told the jury that all that he wanted was for the jury to try this defendant just as though he was a white man, and that if the jury did not believe him guilty beyond a reasonable doubt he wanted them to acquit. When counsel objected to this remark he again in substance stated the same thing."

The other two bills, nine and ten, complain that while the district attorney, Mr. Jones, in the ninth, and the said Mr. Buchanan in the tenth, were respectively addressing the jury, stated a number of times during the argument that the boy, Baby Dunlap, a negro, referred to in the testimony, was the son of George Dunlap, a white man, who is a witness for the defendant. The appellant objected to this, because, he claimed, there was no testimony showing that George Dunlap was the father of Baby Dunlap, and that such argument was made for the sole purpose of prejudicing the minds of the jury against appellant and calling attention to their objection to the State's cross-examination of said George Dunlap on that subject, as shown by his bill No. 1, and claiming that the court stated in reply to his objec-

MILLICAN v. THE STATE. 447

tions that the prosecution had the right to draw any deduction that they might want to from the testimony in the case as to whether George Dunlap was the father of Baby Dunlap. The court in allowing the bill made this explanation: "George Dunlap declined to answer the question as to whether Baby Dunlap, a brother of defendant's, was his son, and was not further pushed by the State for answer. I was of the opinion that the State's counsel had the right to argue that he was Baby Dunlap's father as a proper deduction from the evidence. Being a witness for the defendant, the State had a right to show his interest he has in this case." Bill No. 10 shows substantially the same objections to the remarks of Mr. Buchanan with the same results and qualification of the bill by the court.

The record shows that the witness, George Dunlap, had, and took, great interest for appellant in this case; that he employed three sets of attorneys to represent him, and hunted up and summoned the witnesses for him, claiming that he did this after investigating the facts and believing appellant was not guilty. The testimony of this witness was strongly against the State and in favor of the appellant in several particulars. On cross-examination he stated, among other things: "I am taking considerable interest in this case. I think I ought to. No, sir, I do not know that it happened so by reason of a little difficulty between my son and Mr. Barker. I will not answer the question as to whether Baby Dunlap is my son. Baby Dunlap is the son of the defendant's mother." The witness then testified in substance that he was an unmarried man and had never been married. That the mother of the appellant had lived on his place from 1889 until after the killing.

The first five bills are clearly insufficient to require this court to pass upon either of them. See sections 857, p. 557, and 1123, p. 732, of White's Code of Criminal Procedure, for the rules which have uniformly been followed by this court as to the sufficiency of bills of exceptions to require this court to consider them. Also James v. State, 62 Texas Crim. Rep., 610, 138 S. W. Rep., 612, and Conger v. State; Patterson v. State; Baker v. State, and other cases recently decided by this court, wherein the authorities are collated and the rules as to the requisites of bills of exceptions reiterated and restated.

However, even if we could consider any or all of these bills, neither of them shows any such error as would justify or authorize this court to reverse the judgment.

As to whether or not George Dunlap was the father of the negro boy, Baby Dunlap, and the argument of the State's attorney commenting on this question, it is clear that either party has the right, especially on cross-examination of the adverse side's witness, to show the relation of the parties, the interest in the case and motives and feelings in giving testimony. In the case of Stevens v. State, 7 Texas Crim. App., 39, the court says: "The extent to which the feelings and motives of a witness may be probed, with a view to test their

influence on his testimony, must in practice be confined to the sound discretion of the judge who presides at the trial." Again: "Cross-examination of a witness should not be so restricted by the court as to preclude full inquiry into his relation to the parties and the subject matter, his interest, means of knowledge and the like." In Daffin v. State, 11 Texas Crim. App., 76, the court says: "Any question which may tend to affect the credit of a witness is generally allowable in his cross-examination. His relations to the accused, or bias for or against him, and the extent of the bias, may be developed in the cross-examination."

The appellant having brought out on cross-examination of Jeff Barker the threat by the appellant against the deceased and the communication thereof to deceased, and that the deceased was afraid of the appellant because of the threat, there was no reversible error in permitting the State to cross-examine this witness on that point. Besides this, the testimony of the State's witness, Lawson, to whom appellant made the threat and requested the witness to communicate it to the deceased, which was done, substantially proved the threat and its communication to deceased, as brought out by appellant, on his cross-examination of Jeff Barker. Speights v. State, 1 Texas Crim. App., 553; Noftsinger v. State, 7 Texas Crim. App., 301; 1 Greenl. on Ev., secs. 448, 449; Edwards v. State, 61 Texas Crim. Rep., 307, 135 S. W. Rep., 540.

There was no error in refusing to permit the witness, Sam Sims, under the circumstances shown by the third bill, to testify that he asked Dr. Meredith for a gun for Al Smith. Neither was there any error, as qualified and shown by appellant's bill No. 4, wherein the State tendered to the appellant the witness, Dr. Meredith. Nor was there any error in permitting the witness, Mrs. Mary Sims, to answer that if there had been anybody with the deceased she could and would have seen him, the record clearly showing that just a few moments or minutes prior to the killing, the deceased passed her house and she saw him and that there was no one with him at the time.

As we understand the appellant's sixth bill, as allowed and qualified by the court, there was no error shown by this bill. Neither was there any error, under the circumstances, in the court refusing to permit appellant's attorneys to read the case to him.

In the complaint of the argument of the prosecuting attorney, shown by bill No. 8, it is not shown that appellant's attorneys requested and the court refused a written charge to the jury not to consider these remarks, and the record nowhere shows any written charge requested. If such remarks were made they are shown not to have had any effect on the jury injurious to appellant, because the jury assessed a life sentence and not the death sentence, which the attorney was urging by these remarks. We would not be understood as holding that any such remarks in any case were proper. The lower court ought to have suppressed them at once. If the death

penalty had been assessed, it might have been incumbent upon this court to reverse this case on this ground, but we conclude no injury was done to the appellant thereby, and as no special charge was requested directing the jury not to consider them, it is not a ground for reversal. Anschieks v. State, 6 Texas Crim. App., 524; Jackson v. State, 18 Texas Crim. App., 586-598; Young v. State, 19 Texas Crim. App., 536; Watson v. State, 28 Texas Crim. App., 34-41; Kennedy v. State, 19 Texas Crim. App., 618; Rahm v. State, 30 Texas Crim. App., 310-313; Wolfforth v. State, 31 Texas Crim. Rep., 387; Wilson v. State, 32 Texas Crim. Rep., 22-24; Jones v. State, 33 Texas Crim. Rep., 7; Boscow v. State, 33 Texas Crim. Rep., 390-392; Wright v. State, 37 Texas Crim. Rep., 146; Gilmore v. State, 37 Texas Crim. Rep., 178; Frankling v. State, 38 Texas Crim. Rep., 346; Hines v. State, 35 Texas Crim. Rep., 158, 32 S. W. Rep., 701; Exon v. State, 33 S. W. Rep., 336; Epps v. State, 33 S. W. Rep., 975; Othed v. State, 33 S. W. Rep., 1084; Masterson v. State, 34 S. W. Rep., 753.

We agree with the lower court in his qualification of bills 9 and 10 that the State's counsel had the right to argue as they did, that Baby Dunlap was the son of the defendant's witness, George Dunlap.

The court correctly charged on murder in the first and second degrees and manslaughter, of which there is no complaint.

In his motion for new trial appellant claims that the court erred in marking out certain words that appear to have been originally written in the charge. This is not shown by a bill of exceptions, and in fact in no way except a mere complaint in the motion for new trial. We, therefore, can not consider this question.

One paragraph of the court's charge is as follows: "If from the evidence you believe the defendant killed the said S. H. Barker, but further believe that at the time of so doing the deceased had made, or was about to make, an attack on him which, from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack, real or apparent, on defendant, and if the weapon used by him and the manner of its use was such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant; or, if you believe from the evidence the defendant killed the said S. H. Barker, but further believe that at the time of so doing said deceased first did shoot at defendant, or that from the acts of the deceased, or from his words coupled with his acts, it reasonably appeared to the defendant, viewed by you from his standpoint at the time, that the defendant was about to suffer death or serious bodily injury at

the hands of deceased, you will acquit the defendant." The complaint of this charge is "that it restricts the right of appellant to act and free himself from such false arrest alone upon danger which was imminent and present at that particular moment when appellant first made his attempt to free himself. While the evidence shows that the deceased had told him that when he got him to his house he was going to give him hell, and the killing occurred 604 feet from the house where the real danger and cause of appellant's fear and apprehensions were to be realized; and that the court should have charged further that the appellant had the right to act, and if necessary to kill the deceased, if the defendant believed he was in danger of serious bodily harm or death at the hands of deceased upon his arrival at Barker's home, even though Barker was making no effort at the time to do him such harm and that the testimony of the appellant raised this issue."

The appellant complains also of the following charge of the court: "If you believe from the evidence that before the killing S. H. Barker threw his gun on defendant and told him he had an order for his arrest, or said or did anything which restrained defendant of his liberty, then you are instructed that said restraint and detention would be illegal, and that Barker, in restraining defendant of his liberty, was a trespasser, and that defendant had the right to regain his liberty by the use of all necessary force, and Barker had no right to prevent him. Therefore, if you believe from the evidence that the defendant shot and killed deceased, but you believe that at the time of the shooting Barker had restrained defendant of his liberty, and you believe that the shooting was done by defendant in an effort to free himself and regain his liberty, and you believe that it reasonably appeared to defendant, viewed by you from his standpoint at the time, that it was necessary for him to shoot to free himself, you will, if you so believe, acquit the defendant; or if you believe from the evidence that Barker restrained defendant of his liberty, and that defendant made an effort to escape, and in making the effort to escape it reasonably appeared to defendant, viewed by you from his standpoint at the time, that Barker was about to kill him, or do him serious bodily injury, and that defendant shot and killed deceased, you will, if you so believe, acquit the defendant, and this, although you may believe that defendant was, in fact, in no danger of death or serious bodily injury." His complaint of this charge is the same identically as the complaint of the charge above first quoted.

In this connection we will give the only special charge requested by appellant as follows: "You are instructed that if you believe from the evidence that the deceased, Sidney Barker, had the defendant's false arrest and the defendant thought that the deceased intended to kill him or do him some serious bodily injury, then you are charged that the defendant had the right to free himself from such arrest

and to resort to any means, necessary for the purpose, and in this connection you are charged that the danger of death or serious bodily injury must be viewed from the defendant's standpoint, and if viewed from his standpoint, the defendant believed that the said Sidney Barker, intended to kill or seriously injure him, then in that event the defendant would have had the right to shoot and kill the said Barker even though the said Barker was making no effort at the time to kill or seriously injure him."

It will be seen by the two paragraphs of the court's charge above that it was more favorable to appellant than the special charge on the same subject requested by appellant and that each of these paragraphs of the charge, given by the court, sufficiently and even more fully covered the points that were asked in said special charge. So that the court did not err in refusing to give that charge.

Evidently the objections urged by the appellant to the two paragraphs of the court's charge above quoted did not occur to the appellant's attorneys at the time of the trial when the court's charge was given and when they requested the special charge above quoted, because, we take it, if they had, they would have requested special charges on the subject and would have embodied the complaints they now make in the requested charge they asked. It is our opinion that neither paragraph of the court's charge is reasonably subject to the criticisms made upon it and that such construction thereof as claimed by appellant, and their criticism thereof, is strained and the charge could not have misled the jury on the points claimed by appellant. Besides this, the court must have given these two paragraphs of the charge to meet the contention of appellant on the trial as to the phases of his defense presented thereby. In our opinion it was not necessary to have applied the facts to an implication of danger to appellant of serious bodily injury after the deceased had gotten him to his house, even to take it that the testimony raised by implication any such question, and, too, if any such issue had by implication been raised, the appellant did not request any special charge covering the claimed point. In our opinion the two paragraphs of the charge quoted above fairly and sufficiently presented the appellant's defenses.

The next complaint of the appellant is that the court failed to limit in his charge the testimony, in which it is attempted to be shown that George Dunlap was the father of Baby Dunlap, to the question of George Dunlap's interest in the defendant. As we understand, appellant's contention on this point is that this testimony and the effect of the argument of the State's attorneys was intended to impeach the testimony of George Dunlap. We do not understand from the record that this was either the purpose or effect of this testimony, but that all of this evidence was for the purpose of showing George Dunlap's interest in behalf of the defendant and his relationship to him through Baby Dunlap. In our opinion it would not have been

proper for the court to have limited this testimony as claimed by appellant. Appellant requested no charge on the subject.

The only other complaint which we have not already noticed in appellant's motion for a new trial is that he claims that the court ought to have given a charge limiting the testimony with reference to Baby Dunlap running his buggy against the deceased and the deceased then and subsequently cursing and abusing him thereabouts. This testimony was introduced by the State for the purpose of showing the motive for the appellant to kill the deceased, and especially in connection with the threat from appellant made against deceased and communicated to deceased at his instance. As we understand such testimony is always admissible, and it is neither necessary nor proper to limit the effect of it. As said by Presiding Judge White in Hudson v. State, 28 Texas Crim. App., 323: "Such evidence being legitimate and admissible to prove a main issue in the case, to wit, defendant's motive and malice in the perpetration of the murder, it was not obligatory upon the court in its charge to limit and restrict the purposes for which the evidence was admitted. The rule as to restriction or limitation does not obtain with regard to evidence proving directly the main issue involved in the trial. Davidson v. State, 22 Texas Crim. App., 373." And in speaking of the same character of testimony and charge on that subject, in the case of Hall v. State, 31 Texas Crim. Rep., 565, Presiding Judge Davidson says: "The court did not err in failing to charge upon the effect of this evidence, and in omitting to restrict it as a fact tending to prove motive or malice. The authorities cited by appellant sustain the proposition that when independent, contemporaneous crimes, or crimes showing system, are adduced and relied on to connect the accused with the offense on trial, or to develop res gestae, or to show intent, they should be restricted to their proper office by appropriate instructions. The rule grows out of the necessity of protecting the accused against conviction of an offense not charged in the indictment, and to guard him from prejudice that might occur on account of such crimes being admitted as evidence. But the evidence under discussion is a part and parcel of this case, belongs to and grows out of it, is not an independent offense, and does not come within the rule invoked by defendant." See also Sullivan v. State, 31 Texas Crim. Rep., 486, and Brown v. State, 24 Texas Crim. App., 170.

It being our opinion that there is no reversible error shown in this case, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied November 15, 1911.—Reporter.]